The next case will be DuPont v. Kolon Industries. Mr. Clement. Good morning, Your Honors, and may it please the Court. The fundamental problem with the proceedings that produced this massive damages award, an unprecedented 20-year global shutdown injunction, was the failure to identify specific trade secrets and the degree to which those specific trade secrets, above and beyond what was publicly available information, allowed Kolon to improve its pre-existing production prize in a way that produced true unjust enrichment. But no matter how many times Kolon insisted that the proceedings go trade secret by trade secret, and no matter how many times Kolon insisted it was absolutely necessary to take into account publicly available information, including the information publicly disclosed in the AXO litigation, no matter how many times they did that, the District Court would hear none of it. Mr. Clement, I hate to break you, train of thought, maybe I can't break it, but the point is, do you want to make any comment on the disqualification issue? Well, I, you know, I certainly would incorporate everything that's been said to this point. I'm not saying you have to say anything else. I just want to give you the chance, since we asked them to say that first. No, I appreciate that. What I would say to Judge Davis in particular is, in thinking about the judgment that the District Court made, if the District Court made an error of law in assessing the significance of the AXO litigation to the trade secret case, for example, that seems something that this Court would have to correct. So if he thought that the AXO litigation was tangential based on a misunderstanding of the legal principles and the relevance of the AXO litigation to the trade secret case, that would seem to be something this Court would have to review. Is that a mixed question? I think ultimately it's a pure question of law, but let me sort of take you to specifically what I have in mind, which is, if you look at page 9 of our reply brief, and there are two illustrations on page 9 of our reply brief, the top illustration is in the National Archives. It is publicly disclosed. The bottom illustration is the only documentary basis for trade secrets 2 through 6. Now, if you look at those two documents, they are awfully similar. And the judge's explanation for why he was going to exclude reference to the AXO litigation is that, well, the top illustration did not disclose the trade secret in its entirety. Now, that is simply legally erroneous, because for two reasons. One, a more general reason. One, a case-specific reason. The more general reason is the burden is not to say that if something has not been publicly disclosed, if a trade secret has not been publicly disclosed in hoc verba, in its entirety, that the public disclosure is not relevant. The public disclosure is still highly relevant for multiple issues in the case. As Mr. Kinnaird pointed out, it is highly relevant for whether or not the trade secret has independent economic value. Because if 95% of the cat's out of the bag, the 5% doesn't have independent economic value. It's also relevant to the reasonableness of the measures DuPont had to keep the matter secret. Because if this secret is in the National Archives, that's certainly not a reasonable effort to keep it secret. But perhaps most obvious... What if nobody goes to the National Archives? Well, I think there are certain things that are just the public domain. And I'd start with the National Archives, probably. But here's the thing where I think the easiest way to show how it's got to be relevant is, and this bleeds over into the mistakes on the damages and in the injunction. But when you get to the remedial phase, this Court's case is most clearly, its Servo case, makes clear that the inquiry is essentially a marginal one. You have to say, look, if they misappropriated something, they took a shortcut, they got something and they saved some money, over what? Over what they would have been able to do if they had relied on information that was publicly available or reverse engineering things that did not involve misappropriation. So you have to compare the margin or the delta between what was the alleged trade secret and what was in the public domain. So those are all reasons why it was erroneous to say that the acts of litigation was not relevant just because the document didn't disclose the trade secrets in its entirety. Here's a case-specific reason why it's even more clearly relevant. Are you equating relevance to matter and controversy for purposes of the recusal motion? I mean, it sounds like you're on the merits of whether the Court erred and not allowing that evidence to come in for the jury to consider whether or not the trade secrets had been publicly disclosed. Are those the same? Well, I guess what I was suggesting is, to the extent the reasoning of the District Court is, well, this isn't a matter and controversy because it's barely relevant at all and it has nothing to do with this case. If that determination is based on an erroneous legal conclusion, then it seems to me that you have to look at the matter and controversy then based on the correct legal principles. And this just underscores how central the acts of litigation was, especially to the trade secret case. The other thing, just to finish my thought on the case-specific reason why the treatment of that top document on page 9 is so problematic, the District Court says, well, the illustration in the National Archives doesn't disclose everything in trade secrets 2 through 6. And specifically, what I think the District Court had in mind is that if you look at the trade secrets as enumerated in the juror notebook, there's four parameters specified for certain of the machines. I'm going to talk a little bit generally because we're in public session, but there's four parameters specified. And the judge says, well, if you look at the top document, only one of those parameters is specified. Well, the exact same thing is true of the bottom document. The document that Colon got from one of the consultants also discloses the exact same parameter and doesn't disclose the other three parameters alleged in one of the trade secrets in the juror notebook. So it cannot be that you can't look at the top document and the jury can't even see the top document because it only discloses one parameter when the very document that's the basis for these trade secrets likewise only discloses one parameter. If there was any problem with the disconnect between what was in the document that Colon received and the trade secrets in the juror notebook, that should have been a sufficiency of the evidence problem. I mean, if they really had a disconnect between those two. But it can't be that there's no disconnect for purposes of evaluating their evidence, but there is a disconnect for evaluating the relevance of that top document from the AXA litigation. Now, if I could sort of broaden the lens as I suggested, I think the real problem here was all of that, just the mistake I just talked about, probably would have been much more evident if this case had been adjudicated the way that this court and Virginia Supreme Court cases suggest a trade secret case should be adjudicated, which is trade secret by trade secret with each element of each trade secret very carefully defined. But the department of strategic judgment in this case, they didn't want to bore the jury. So notwithstanding the fact that they had 149 trade secrets, they really tried to essentially try them en masse. And that created several problems throughout the case. But let me focus your attention on the damages and the injunction. Because there, as I suggested, this court's cases, particularly the Servo case, but also the Sperry Rand case, are very clear that unjust enrichment. Is your concern with the presentation of the evidence of the form of the verdict? What's your concern about not being able to know trade secret by trade secret? Well, with respect, Your Honor, it's soup to nuts. And this really goes back. I mean, we could start with the complaint, which doesn't identify specific trade secrets. And maybe it's hard at the very beginning of the case to get very specific. But that's why you have an opportunity to amend your complaint after you get this information and discovery. But isn't it true, sometimes the district judge is faced with a lot of claims. And not each one is given full, full breath in the courtroom. And sometimes, doesn't that bleed over into case management sometimes, though, Mr. Clement? And how a judge allows a party to present their case. Because somebody wants to bring 50,000 unfair trade practice claims, that doesn't mean the judge has to sit there and let there be evidence of 50,000 claims we've put in over six years. I mean, there is some management of the courtroom that the judge can do, isn't there? Absolutely, Your Honor. But it can't come at the expense of proving every element of the claim that's the basis for liability. And I would respectfully suggest that if a plaintiff comes in. But wouldn't that argument likely be made any time a court wanted to sort of truncate some procedures? Well, I don't think so, Your Honor. And I guess I would suggest that if a plaintiff comes in and says, I have 50,000 trade secrets I want to try for you, Your Honor, I think the proper response is, get out of here. Come on. I mean, let's boil this down. I would look for a way to recuse myself. That would be the right first call. But then I think the second call would be to say, look, nobody's misappropriated. This was 16 documents, 750 pages on the technical side. Now, when you get 16 documents and 750 pages, I suppose you can divide that up into 149 trade secrets or 16 categories, which they originally did. But I think the district court's got to say, look, you've got to make this manageable. Help me make this manageable. But not at the expense of premium element. Isn't that why we have requests for admissions? What's that, Your Honor? Isn't that why we have requests for admissions? I mean, Cohen could have narrowed the universe here. Well, we asked them to. I mean, we asked for, in our interrogatories, we asked, what are the specific trade secrets here? And we were given 16 categories that then were later, after discovery closed, put together in 202 trade secrets. It was then dropped to 192, eventually 149. So we didn't get the specificity we asked for. But if I could just turn your- Did you not use requests for admissions? I mean- I think we did in this- One through 169 or whatever it was? Well, we couldn't get the specificity  I guess the reason I'm raising requests for admissions is because you get to formulate the specificity in a request for admission. And it's either admitted or denied and you can do it in the form of a factual question and that's- But with respect, Your Honor, it's not our burden to frame their claims. These aren't just factual matters. These are their claims. I mean, Virginia law says, as to each trade secret, you have to satisfy every element. I think that- Is your argument that had you been able to get the information you wanted, then you may be able to frame requests for admission? That's a very fair way to put it, Judge Shedd. And I would say that the problems here were not just with the merits phase. It also spilled over into the remedial phases because not having preceded trade secret by trade secret, but really having lumped all of this information together, then when it came to damages, well, the damage theory followed that directly. But we think the damage theory was fundamentally inconsistent with this court's decisions and Servo and Sperry-Rand. Because what their expert did is, instead of looking at individual trade secrets and saying, okay, by getting this trade secret, instead of getting this from the public domain, you save X amount of money. Instead, they basically calculated the acquisition costs, and then, which, you know, aren't the right thing to be focused on. And then they refused to make the adjustments necessary for that proxy to have any fit whatsoever to the value of the trade secret. Go ahead, I'm sorry. No, you go. But you presented evidence to the jury, they rejected it. But it's not just a matter of, he said, she said, and the jury gets to decide. The jury doesn't get to decide based on, A, being fundamentally misinstructed, which we submit they were, because they were told unjust enrichment, but without the criti-factor that we tried to get the judge to add, which is, it's unjust enrichment vis-a-vis what's available in the public domain. And without that, it's critically a mistaken inquiry. And then the other point I would say is, the jury also can only make this determination if it's based on reliable expert evidence. And we challenge the Jura's report because it really is, the assumptions in that report are fundamentally unreliable. And the best way to illustrate it is, if you're gonna use their development costs that include all their development, including the products that led to, or the research that led to patents, you have to make some adjustment for that. This is a case where the trade secret documents, 16 documents, 750 pages. Well, DuPont, through the same research that Cologne's been basically told to pay for, generated 730 para-ermid patents. Now, their response when they say, well, look, you just made us pay for all this publicly disclosed stuff, is to say, well, it's too hard to sort of factor that out. Well, if it's too hard to factor that out, you can't use this methodology at all. It's not like, well, I've looked at a completely different number, and in order to adjust that, I need to make certain adjustments, but the adjustments are too hard. If that's the case, that doesn't mean you're excused from making the adjustments. That means you have to go about it differently. And we did do it differently. Does the defense have an obligation to at least make the argument with respect to the adjustments? Your client? And we did. Our expert jury rejected that. But again, we don't lose our D'Albert challenge because we tried as a second best alternative to make an argument to the jury that was rejected. And I think that's essentially one of the ways to think about what happened here, is that we quote the Seventh Circuit language in our opening brief, which I think captures this perfectly. You see it as, in any trial, you make motions, you make requests, you lose some, you win some, but you don't get to stop the game then. You gotta keep playing by whatever the rules are announced. Absolutely, absolutely. And you gotta move to your second best argument. If you think their experts shouldn't even go on there at all, well, when you lose that, the next thing you do is you put your expert up, and your expert does it the right way. And one of the pernicious things that's been suggested here is our expert said their methodology was fine. That's completely wrong. And if you look at the two expert reports, they are miles and miles apart. All our expert said is, yes, avoided cost and unjust enrichment are relevant concepts, but it's avoided cost vis-a-vis what's in the public domain. And that vis-a-vis what's in the public domain is what's missing from their approach. If we were persuaded that you were prejudiced, your client was prejudiced, could we plausibly remand for a trial on damages only? Or would you think that would be totally unfathomable? I don't think that would work in this case. And I think it wouldn't work for this case largely because the damages and the all or nothing shutdown injunction are all of a piece with the way the case was tried. So I think that if you were to vacate damages, vacate the injunction, but try to hold liability, I think that the second jury would be in a very difficult position. They'd almost, I think to get the damages right and the injunction right, you'd have like a completely different case being adjudicated. And I think that would violate Seventh Amendment principles and it's an old chestnut, but I think it's still good law. The gasoline products case is you can't just sort of have. But let me ask you this, Mr. Clement. Rules of the game. If you can't get it all, you want half of it? Well, of course, Your Honor. Of course, Your Honor, we certainly do. But we do think this is the case. No, I was just asking. That's one of those rules of the game that you face with sometimes too. Yeah, no, absolutely, absolutely. But I do think this is one of the situations where, you know, any time you get a damages verdict this large, an injunction this overbroad, I'd suggest that something went profoundly wrong and I don't think what went profoundly wrong was limited to the remedial phase. Yeah, wait, we have one more question. With respect to the trade secret issue and the public disclosure, as I recall, that affected at most 40 some odd of these trade secrets that you were claiming, your client was claiming, were in the public domain. If we agree with you with respect to that, does that taint the other 100 and some odd trade secrets that there was no evidence presented with respect to public disclosure? Well, I think it would, Your Honor, in the following respect, which is to the extent we got to the point where we had a different understanding of what the public disclosure meant, even if there are other trade secrets where that didn't directly affect that trade secret, it would still go to other issues in the case. For example, the reasonableness of the steps that DuPont had taken to preserve the trade secrets, because if closely related trade secrets are being disclosed in the National Archives, that's not an issue that's really a trade secret by trade secret alone. I think that issue would infect the others. The other thing I would say is that, let's take a number like 40. If you knocked out 40 trade secrets from this case, the damages theory and the injunction fall as a matter of course. I understand that. And then I think you, for the reasons we just discussed, need a new trial on everything. Thank you, Your Honor. Thank you. You reserve some time. Mr. Charnes? Good morning, and may it please the Court. My name is Adam Charnas, and I represent DuPont. At trial, DuPont put on meticulous evidence, trade secret by trade secret, that Collin acquired each one of these 149 trade secrets, that each one satisfied the Virginia statutory standard, and that Collin used each one of these trade secrets. Mr. Clement's argument, and Collin's argument generally in this case, that the trade secrets were tried en masse is simply a fiction of their imagination. The fact of the matter is, if you look at the record at trial, what DuPont did was it put on a number of its technical scientists who had worked on Kevlar for decades. Dr. Gabbara, Moore, Lukey, and Simpras. And they testified at length about the entire process of creating Kevlar from start to finish, from the very beginning to the very end. They testified what happened at each step of the process. They identified the trade secret almost always by number as they were describing that. They described why that information was secret or was not generally known. Each step of the process, from earliest steps of pre-polymerization through spinning and the finalization of the process. Part of Mr. Clement's argument, though, is that, well, I don't think he concedes that that's the way it went down at trial, but they argue that this was an ongoing process. From the beginning of the case through trial, they were faced with a moving target with respect to these trade secrets and could never adequately prepare to defend the case as a result. What's your best answer with respect to that? There are two responses. First of all, that's flatly false. One of the reasons that DuPont had trouble, however, was Colon's misconduct in this case. Not only the spoliation, which I'm sure the court is aware of after the complaint was filed, it took DuPont Herculean efforts assisted by the district court to get Colon to reveal the details of what had been destroyed and produce documents that had been able to be recovered, but also their resisting discovery throughout the process. So part of the reason for the delay in providing information, if there was any delay, what lays at Colon's feet in not participating in discovery as every party under the federal rules is required to do so. But their claim is simply not true. If you look at the second supplemental interrogatory response, it begins at page 4313 of the appendix. It goes into excruciating detail, excuse me, about what these trade secrets were. And, you know, DuPont in its brief has a very misleading statement where they say, they quote part of the first response, the first category of trade secrets that is discussed. It says, well- When were those supplemental interrogatories served? Were they well in advance of trial? They were served in March of 2010. Okay. At the district court's urging, DuPont served an additional, more detailed description of the trade secrets in October, 2010. And then before trial, trial was originally gonna be in the spring before it got delayed in February, 2011, had yet another description. And the interesting thing is what's- Well, but isn't that the point? It kept changing? Well, it didn't kept, it wasn't changing. There was additional detail and information that was added. But the basic trade secrets that were alleged were the same from the beginning with the exception of the few that were omitted along the way. But the interesting thing about Collin's briefs is they don't argue or let alone demonstrate that they were prejudiced at trial in any way by not, by any sort of late disclosure, which as I said, I think is in their imagination, of the trade secrets. At the time of trial, they knew what these trade secrets were. And Judge Payne was actively managing this process. He was all over the definitions of the trade secrets and whether the trade secrets were adequately defined in discovery was well within his discretion and when he ruled that they were. You know, with respect specifically- Let me stop you for just one second, Mr. Charnas. I want to give you the opportunity, if you want to take it, I hate to interrupt your argument too, just give the opportunity, if you want to, you need not, if you want to comment on the recusal, disqualification issue at all. I will leave it in Mr. Gardner's hands. The only thing I will add is, of course- No, you won't leave it completely in his hand. Okay. 15 seconds. No, it's your time. If the court, in their brief, in the trade secrets case, they did not make a recusal argument, okay? So if the time of recusal is set for- I thought they incorporated it by reference. Well, but this court has said many times that you're not allowed to do that. So if this court sets- But they say that your own notice of it, aren't you? Well, yes, sir. But if they, if the time of, if the court determines that recusal is necessary and triggers the time is after severance, then we would just say that they've waived that for purposes of the trade secrets case by not arguing in their brief. But otherwise, I will leave, maybe that was more than 15 seconds, but I will leave it in Mr. Gardner's hands. Okay. I do want to talk about the so-called public information, in particular, page nine of their reply brief. There is no doubt that there is a lot of public information about para-aramid out there. But the fact of the matter is, if you assembled a manufacturing plant based on the public information, like Hollande did before they stole our trade secrets, you could produce a para-aramid fiber that nobody would want to buy, that was not of sufficient quality. These fibers are used in bulletproof vests, body armor, tires, brakes, and other safety-conscious materials. And that was Hollande's problem, is that they could not get from the general body of information that was available to a product that people wanted to buy. And the trade secrets are what let you get from producing a mediocre product that nobody wanted to buy to a product with the quality of Kevlar. You know, one way I thought about this is, if you want to produce a car that can win the Indianapolis 500, okay, there might be information in the public domain that allows you to produce a VW Bug, but the trade secrets are what allow you to go from the VW Bug to the IndyCar. And that's shown... As I understand it, the argument here is that with respect to damages, the argument is that you recovered damages for stuff that was in the public domain, and that's how the jury arrived at the $919 million or whatever it was. Judge Davis, you've said what their argument is. The problem is, it's contrary to the evidence of trial, or at least, maybe put more precisely, the jury had contrary evidence on which they could have based this verdict. What DuPont... But you just said that they had a plan. They were manufacturing something, and they were doing that in part in reliance on information and ostensible secrets that your client had put out there. Well, no, what... So you don't dispute that you're not entitled to cover anything for any of that? Well, with a... I think what the DuPont witnesses testified and on which Jarrus based his damages analysis was that what they did was, they did research and development over 30 years that aimed at creating a product, and once they had the product, they said, how are we going to protect this product? This part of it... But did they produce any VW bugs along the way? They did not, and that's the point. Maybe that was a poor analogy, but the point is that what they said was they came up with a product, an integrated, interrelated product, very complicated, as you can see from... I mean, the chart on page nine is a very small part of the entire process. They came up with this integrated, interrelated product, and they said, well, how are we going to protect it? Some parts or some aspects of some parts we will put in patents, and some parts we'll keep as trade secrets. But what the testimony at trial was from the fact witnesses on which the damages expert based his testimony was that that was a unified body of knowledge that was created. You can't separate... The fact witness said you can't value the information that ultimately went into the patents. Wait a second, let me ask you this. Are you saying then the 30 years' worth of development, that everything that was needed for your final product was known from day one or day two? No, no, of course not. Do you have research that didn't get you to your final product? And that's part of the trade secret. The courts have said part of the... No, I know this, but I'm going back to your Volkswagen analogy. And so, did you have any Volkswagens? No. Well, I thought that you were suggesting that the information they got might have allowed them to produce a Volkswagen, and hence, that's why you said they could produce something, but it wasn't the Ferrari, I don't know, whatever you said, whatever, the race car that could win an Indy 500. Well, they tried... But it seems to me then, that makes your argument that some information along the way... Because, by the way, your answer makes sense to me. You wouldn't have 30 years' worth of research to get to this product if you could get to it at day one. Well, nobody would do that. And so, well, that information, as Judge Davis is asking, as he, I think, outlined the argument we've heard, to me, there would be some information in that 30 years that is helpful, but it's not critical, but yet, at the time you developed it, you didn't know it wasn't going to be critical. Your Honor, that is a hypothetical, which may be true, may not be true. Collin didn't present a single piece of evidence that was the case... Just let me say, I got that from you. I didn't get it from them. I got it from you just now. Their argument in their brief is that the public information saved them time and money. I think that's basically... But the problem was, A, DuPont's witnesses said that's not the case. It wouldn't have saved them any information. You've got to start from the start. But it doesn't make sense. Your analogy would indicate that's not true, and it just doesn't make... I don't care what an expert says. You can use common sense, don't you? Didn't the jury always instruct you on common sense? Well, that's true, but this wasn't expert testimony. This was the witnesses. This was Cabara and Moore and the other technical... It doesn't make any difference. Well, it doesn't have to... You don't have to accept any witness's testimony. Well, that's a good... Judge said the jury doesn't have to, but it may. And the point here is that Collan did not present any evidence... No, no, no, but that's not the point. The point is, I don't know if it's true or not. I'm going to have to look at this, on this very fine point. But it doesn't make a difference what somebody says and what they may accept. If, in fact, the instruction or the judge's ruling on how you go about assessing damages and the evidence to do that properly, if that's not there, then the jury may accept it, but the jury's result wouldn't be legally correct. Well, I think... Or legally authorized. I think this is a factual issue, not an instructions issue. That is to say, what DuPont's witnesses testified was, that in order to get to the high-quality product that people want to buy, you need to start the research from ground zero. Taking the public information doesn't get you anywhere. You need to do the whole 30 years, $900 million, $800-some-odd million of research. Now, Collan... So you're saying that your experts, your witnesses, couldn't have taken 25 years' worth of research from somebody else and then worked from that to make a product they wanted to sell? What they said was... I'm not just saying... That doesn't make sense. Does that make sense? If that were true, then Collan could have brought one of its employees in and said, hey, you know what? Here's all the patents. This saves me five years or whatever. They didn't do that. Not a single Collan employee, current or former, testified to say that or anything else in this case. So... If I understand your argument, you're saying, if you take 149 ostensible trade secrets, you could put 140 of them in the public domain and ultimately prove up only nine, and you still get $919 million. Is that your argument? Do I get that right? I'm not sure that's the precise argument, no. I think that... How did what I just say differ from what you're saying to us now? Well, for example, if you only had nine trade secrets that were limited to a particular part of the process, it may well be that the cost of developing the process start to finish was lower in that hypothetical. But that wasn't the case here. The 149 trade secrets span the range of the manufacturing process from beginning to end. So it wasn't... So answer his question. That's his question. You say 149 were critical, 140 each was critical, 140 are known to everybody, but your nine really make the difference at the end. You're entitled damages across the board for all of that? Research and development costs? It depends on what the nine were. I think it's unlikely that that would be the case. Well, I think your argument is even better than that because you say that not only do you get those damages, but the jury doesn't get to consider whether or not the hundred and some odd that are in the public domain somehow infected or may have affected the nine ostensibly secret items. No, Judge, that's not my argument at all. In fact... Well, the jury didn't get... They did. They put these patents in, they cross-examined our witnesses on the patents. What about the information with respect to the 40-odd trade secrets that they say the ATSCO litigation would have been relevant to? Well, there was extensive evidence before this jury that they put each of those patents in, and they were able to argue to the jury, and they cross-examined our witnesses, and their experts testified regarding information in the public domain and supposedly covering these trade secrets. And if you look, going back to page 9 of their reply brief, the problem that they had... Well, first of all, they say these two charts are similar. Well, Coke and Pepsi are similar also. That doesn't mean that Coke doesn't have a trade secret. Not according to Coke and Pepsi. My taste buds, they are, Judge. There is information, and we're in pubescent, I can't be too specific. There is information in the bottom chart, which is confidential, was not in the ATSCO. It is not in the top chart. If you look at it, and I need to take my glasses off for this because I'm getting old, in the bottom left-hand corner, just one example, there's a little box that has what looks like a sideways A or the infinity sign that has two parts of the process that are trade secrets that are not disclosed in the ATSCO. Why couldn't the jury be entrusted to make that determination? Well, what Judge Payne said was two things about ATSCO. He said, number one, that, as we heard, there were hundreds and hundreds and hundreds of boxes of documents from ATSCO. And he said to Colon, show me a page or pages of the ATSCO documents, point to a specific trade secret anywhere in there. And they weren't able to do that. In their appellate brief here, they have 30,000 words, and they didn't point to a single, this is the best they could come up with. There's not a single proof in their briefs, here or below, that there were any trade secrets in the ATSCO documents. He also ruled based on 403, and what Colon did in their brief was totally, does there have to be a perfect marriage, or is it enough simply that there be some overlap? Well, the point here is that there wasn't, he found that there was an overlap. In other words, there was not any of the 240, you were looking at that document, you were trying to make distinctions, but it also suggests then that there is some overlap. No, well, there's overlap in the process, but there's not overlap in the trade secrets. The trade secret information in the bottom document is not in the top document. The overall process is well known. The key is how you do things, temperature you do things. Why use this piece of equipment instead of that, that piece of equipment. How long things are. The dimensions of things. That's the trade secret. Let me ask, before you run out of time, why isn't lost profits the better and primary measure of damages in this case, and why wasn't that presented to this jury? Well, lost profits, the Virginia legislature adopted the Uniform Trade Secrets Act that has alternative measures of damages, and one of the measures permitted under Virginia law, and under the Uniform Act more generally, is unjust enrichment damages, and that's what was pursued here, and what the cases say uniformly is unjust enrichment damages are the cost of replicating the trade secrets, and that's what DuPont proved here, and Collin makes the argument that somehow this is not permissible under Virginia law, or that use has to be shown. He argued, as part of your argument, contained this, that there's something in the public domain, or at least arguably in the public domain, that is still to be, you are allowed to use whatever that process or information is as part of your measurement of unjust enrichment. Do you claim that? No, we don't. What we claim is the cost of replicating these trade secrets. Well, but is that what's in the public domain? Is that part of replicating what you call a trade secret? Because you said it's a whole 30-year process. It's a 30-year, that's right. And so is any of that 30-year process something that's in the public domain? This would be a yes or no would help me. How about a yes, but? You can yes and explain it, sure. Yes, but the point is that the evidence of trial was, by the fact witnesses, this wasn't an expert making this up on his own, was that in order to replicate the trade secrets, you have to do all that research that occasionally spun off some information that went into a patent, that you don't save any money by starting with the patents and then going to the trade secrets. Now that may... Go ahead, I didn't mean to interrupt. I apologize, Judge Davis. Is there a conflict between unjust enrichment damages and a 20-year injunction? There isn't. There isn't? There is not, and the reason is... But isn't the damages award based on unjust enrichment, doesn't that make you whole? And has Cullen bought, haven't they paid for what they stole now? Well, in fact, they haven't paid for it. They did not... The admission ticket, the price of admission for them making that argument is paying the judgment. Well, I understand that. I understand that. I understand that. But I mean, if they paid the judgment... No. Are they still excluded for 20 years? They did not pay the judgment. They did not post the bond, and they're fighting to the death. I said, if they pay the judgment... And the answer is no. I apologize. Explain. I don't want you to take a lot of your time that's left, but... I'll take 55 seconds. Okay. The Seventh Circuit explained this in 3M. The unjust enrichment damages are backward-looking. You stole our trade secrets. When you steal them, you owe us the amount that it costs to replicate them, and the injunction is forward-looking to prevent further harm that's not taken into account. For example, here, they have this information of ours. First of all, I'd also say, Your Honor, that they only challenge one aspect of this injunction, and that's the production injunction. They don't challenge the use injunction. They don't challenge the requirement that they return our documents to the extent the trade secrets are reflected in the documents. They don't challenge the disclosure of it. So we're really talking about a very limited set. The difference between use and the production injunction and what Judge Payne said, based on a plethora of evidence in the record, was that they couldn't be trusted just with a use injunction, not to actually produce it. And that's the difference, is that we would be continually harmed that's not reflected in the damages award if an injunction weren't in. Thank you. Thank you very much. Mr. Clement. Do you all want a break after this? I don't need one. Do you need a break after this? I'm fine. Okay. Mr. Clement. Just a few points in rebuttal, Your Honors. First of all, there's obviously a dispute between two parties about whether this really went trade secret by trade secret or not. We were told by Judge Payne numerous times that he was tired of us complaining about it not going trade secret by trade secret. So we really do think we have the better of the argument. If you're going to look at something just as an example of this, I'd ask you to look at Joint Appendix 8405 through 8411. That's where 17 trade secrets were dealt with in those six pages. And they really were dealt with en masse. The economic value for all 17 was based on testimony about information derived from a handful of documents. In terms of the two points also kind of about the way the case was tried, the moving target point, I mean, to be clear, it went from 16 categories, but not specifically enumerated trade secrets, to 204 trade secrets in October of 2010, to 192 trade secrets in February of 2011, to 155 in the juror notebook, and 149 when it was finally adjudicated. To this day, I have to be honest, I have no idea whether their ultimate theory is the trade secrets or what's in the juror notebook or what's in the documents themselves, because they went back and forth on that. In the post-trial briefing, they were saying, no, it's not just what was in their notebook, it's really what the documents that Colon got in from the consultants. But then when you look at the injunction, the injunction incorporates by reference, which is a Rule 65 violation, but the injunction incorporates by reference the juror notebook. So this has been a moving target from the beginning to the end. In terms of the ruling about the relevance of the AXO litigation, I think as your colloquy with my friend showed, the district court clearly put Colon to an impossible burden. He says, well, at no point did Colon show that the documents in the AXO litigation disclosed the trade secret. Well, if the publicly available documents in the archives disclose something, it's by definition not a trade secret. And of course, they knew what was in the public disclosures in the AXO litigation. So when they're trying to formulate their 149 trade secrets, I mean, this isn't like a patent where you kind of know what the intellectual property is beforehand. They get to craft these 149 trade secrets. Well, they can try to craft them around what's been publicly disclosed. And in that sense, unless they're doing their job very poorly, it may be hard for us to point to a public document that has in hoc verba the trade secret they're alleging. But when you have information that's highly relevant, that's, you know, again, you can find differences between those two charts on page nine of our reply brief, but you have to look pretty hard. And half of the difference is cut in the other direction, which is to say there's more information in the public document than in the alleged trade secret document. That's clearly something, I don't know how a jury can decide whether that bottom document is a trade secret or the basis of five different trade secrets without getting to take even a peek at the top document. Now, let me talk about the remedies before I sit down. On to damages, I think the discussion with my friend was very clarifying because, as he put it, this is not a case where my client had nothing and then acquired trade secrets and then all of a sudden had something. In that case, you might be able to at least meaningfully talk about these broad remedies, either a complete shutdown injunction or kind of an all-development cost damages award. But that's not the case. This is a case where, as they admit, we had something before based on publicly available information. And if you go back to the beginning, their complaint, and, of course, this case looks much different from what their complaint says, look at paragraph 57 of their complaint. When they are talking about what they want in terms of relief, they are talking about the fact that we got unjustly enriched because we improved the quality of our product faster than we would have been if we hadn't misappropriated these trade secrets. All right, that's right. That's how you measure damages. But that doesn't allow you to get 30 years of development costs, part of which led to 730 patents in the public domain. You have to look at the margin. And that's just not me saying it. This court said that in the Servo case. So then on the injunction, again, here I think it's very important to recognize that we did have this existing production facility. We were able to, as my friend indicates, put that together based on two things, publicly available information and equipment that we bought off the shelf from foreign manufacturers. So this is not like the Coca-Cola trade secret where they put all their eggs in the trade secret basket. They also used the patent system. Information was available. Maybe we couldn't produce Ferraris, but we could produce something. So in that context, to have a shutdown of all production is completely overbroad in terms of a remedy. The other thing I would say is he suggests, well, what was in the public domain in these patent disclosures is just very poor quality. I bet that's not what they told the patent office when they got these patents that had to be novel improvements over the prior art. So I would dispute that. But in all event, the basic problem here is not how much of an adjustment to make, but no adjustment to make. If I could just say, there's a suggestion of waiver on the recusal. I think under the circumstances of this case, we worked really hard to not have a 100-page brief. We filed it 99 pages, and I think by incorporating with the way these two cases came up was the right call. But you'll be the judge of that. Thank you, Your Honors. Thank you very much. We'll step down to Greek Council and go to the next case.
judges: Dennis W. Shedd, Andre M. Davis, Albert Diaz